**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

COOPERSTOWN PROPERTIES, LLC and COOPERSTOWN DREAMS PARK, INC.,

Plaintiffs,

v.

JOEY DUFFIELD and BASEBALL DOESN'T EXIST LLC,

Defendants.

6:25-cv-1079
(ECC/ML)

Bruce R. Ewing, Esq., *for Plaintiffs*
Nicole Haff, Esq., *for Defendants*

**Hon. Elizabeth C. Coombe, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

Plaintiffs Cooperstown Properties, LLC and Cooperstown Dreams Park, Inc. initiated this action alleging violations of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a)(1)(A), the United States Copyright Act, 17 U.S.C §§ 101, *et seq.*, New York common law, and New York General Business Law § 360-1 against Defendants Joey Duffield and Baseball Doesn't Exist LLC, arising out of a video, "Cooperstown, Where 12 Year Olds Dreams Go To Die," that Defendants created and posted on social media. Complaint (Compl.), Dkt. No. 1. Presently before the Court is Defendants' motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 15. The motion is fully briefed, Dkt. Nos. 15, 20, 21, 22, and the Court heard oral argument on September 10, 2025. For the following reasons, Defendants' motion to dismiss is granted in part.

## I. BACKGROUND[1]

Cooperstown Properties is a North Carolina limited liability company. Compl. ¶ 7. Cooperstown Dreams, a North Carolina corporation, operates the Cooperstown Dreams Park (Dreams Park) youth baseball facility in Cooperstown, New York. *Id.* at ¶ 8. Cooperstown Properties and Cooperstown Dreams are "related through common ownership and otherwise." *Id.* Together they have "provided world-class youth baseball camp services for nearly thirty years." *Id.*

Plaintiffs record events at the baseball facility "depicting, among other things, game activities, fans having fun in the stands, award ceremonies, and other footage showing attendees enjoying Plaintiffs' youth baseball tournaments and related camp activities." Compl. ¶ 20. "Cooperstown Properties owns all copyrights in and to" these videos, which "are used solely for advertising and promotional purposes on social media and Plaintiffs' website." *Id.*

Cooperstown Properties also owns federal registrations for the marks COOPERSTOWN DREAMS PARK and DREAMS PARK, including the COOPERSTOWN DREAMS PARK logo:

*Id.* at ¶¶ 15-16. In addition, Cooperstown Properties owns a registered copyright in the logo, *id.* at ¶ 19, and five copyright registrations for excerpts from the promotional videos at issue in this

[1] These facts are drawn from the Complaint. The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations, *see Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020), but does not accept as true any legal conclusions, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

case. *Id.* at ¶¶ 20–21. Finally, Plaintiffs also own common law rights in COOPERSTOWN DREAMS PARK, DREAMS PARK, and related marks. *Id.* at ¶ 17.

Defendant Joey Duffield, a Virginia resident, and Defendant Baseball Doesn't Exist LLC, a Virginia limited liability company, operate social media channels including a YouTube channel, "Baseball Doesn't Exist," which has over one million subscribers, an X account, an Instagram account, a Facebook account, and a TikTok account. Compl. ¶¶ 23, 24. Defendants created a video at the center of this lawsuit: "Cooperstown, Where 12 Year Olds Dreams Go To Die." (the video). *Id.* at ¶ 25. Defendants posted the video to their X account from approximately June 9 through July 3, 2025, resulting in more than 2 million views. *Id.* at ¶¶ 29-31. On approximately June 10, 2025, Defendants posted the video to the following accounts resulting in the following number of views/likes: YouTube resulting in more than 570,000 views; TikTok resulting in more than 290,000 views; and Instagram resulting in more than 53,000 likes. *Id.* at ¶¶ 32, 33, 34. On that same day, Defendants also posted the video to their Facebook account. *Id.* at ¶ 35.

The video displays Plaintiffs' registered marks and logo, and the logo, which is protected by both a registered trademark and copyright, is an exact copy. Compl. ¶ 26. The video also displays the following excerpts from Plaintiffs' promotional videos: (1) two photographs: the "entirety of the photograph" of a young Mike Trout and a slightly "cropped version of the photograph" of a young Bryce Harper and his coach (collectively the MLB photos), *id.* at ¶¶ 20-21; Dkt. No. 15-1 at 16-17, and (2) three video excerpts: (a) a two-second excerpt from a 35-second video, "Championship Social Media 1," (the championship excerpt), Compl. ¶¶21, 27, Dkt. No. 15-1 at 16; a four-second excerpt from the Orientation 1 video depicting tournament attendees, (the Orientation 1 excerpt), *id.* at ¶¶ 21, 27; and a five-second excerpt from the Orientation 2 video

depicting tournament attendees, (the Orientation 2 excerpt), Compl. ¶¶ 21, 27. Defendants did not have consent or authorization to use any of the protected materials. *Id.* at ¶¶ 37, 41.

The video is approximately 1 minute and 50 seconds long. Within the first 18 seconds of the video, the logo is reproduced for approximately two seconds, and the Orientation 1 excerpt/Orientation 2 excerpt for approximately two seconds each. During this 18-second introduction, serene music plays in the background and a voiceover for the video states, with nostalgic inflection,

> Welcome to Cooperstown Dreams Park, perhaps the largest youth sporting tournament in the world. Located in the middle of a majestic lakefront rural town where America's pastime was invented. And now, close to 200 years later, it's where every American boy's dreams go to die!

The video abruptly changes tone, with faster paced music and a more intense voiceover. The voiceover describes, in mocking tone, youth players who are so talented by measure of their local communities that they are "going pro for sure," and are "so good, they want you on the travel team." The voiceover continues to state that "they" are "sending you to Cooperstown," and commenting on the financial expectations ("the rich kid just got a new Easton"), as well as the number of youth athletes hosted by Dreams Park every year ("that's like 17,000 kids a year"). The video cuts to a depiction of the purported lodging arrangements at Dreams Park, with the voiceover commenting that the youth athletes are "all packed on top of each other, in bunk beds, in a barrack, like you're about to go to Vietnam. And you basically are." The video pokes fun at the nature of the teams and players they will face at the tournament, noting the first game is against the "EvoShield, Diamond Elite 12U National Louisville Select," and that their starting pitcher "tested positive for growth hormone," and strikes out "17 batters in three innings somehow." The voiceover returns to its point about the financial and attending familial strains of participating, stating that "Dad's working overtime and Mom just got a second job to afford this shit. And now

they're in a fight because you just lost 25 to 0 to a team from Boca Ra-tone called the Bombers." The voiceover describes the Bombers, noting "their first baseman has three kids. The shortstops committed to Vanderbilt, and the leadoff batter doesn't even speak English." The championship excerpt appears for approximately two seconds during this segment. The voiceover then quips that you "start to realize that making the All-Star team in a suburb outside of Indianapolis wasn't as impressive as you thought," measuring the comparatively minimal tournament statistics of now-pro baseball players Mike Trout and Bryce Harper against that of a "kid from Florida [who] hit 19 home runs in a fucking week last year." During this commentary, the MLB photos are shown for approximately 3 seconds. The video concludes with the following reflection by the voiceover:

> But it's not all bad. You got a home run yourself. Sure, it was on a 200 foot fence while using a drop ten bat with the barrel the size of Mark Maguire's forearms, but who cares? You got a bunch of pins. And according to your dad, on the 12-hour ride home, you can actually make a lot of money in the trades nowadays.

Defendants received revenue from their use of Plaintiffs' intellectual property, including revenues stemming from the millions of views of the video and/or advertising place alongside the video on social media platforms. Compl. ¶ 42. In addition, the video "led to increased traffic to Defendants' website and social media accounts, creating increased awareness of Defendants and their business and growing their prominence in the marketplace." *Id.* at 43.

## II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level[.]" *Id.* (quoting *Twombly*, 550 U.S. at 555). A court must accept as true all factual allegations in the complaint and draw all reasonable inferences

in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"The Court may also take judicial notice of works incorporated into and relied on in the Complaint." *Bus. Casual Holdings, LLC v. TV-Novosti*, No. 21-cv-2007, 2022 WL 784049, at *1 (S.D.N.Y. Mar. 14, 2022) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)). "[W]here copyrighted and allegedly infringing works are 'incorporated by reference into the pleadings, the works themselves supersede . . . any contrary allegations, conclusions or descriptions of the works contained in the pleadings.'" *Id.* (quoting *Brown v. Netflix, Inc.*, 855 F. App'x 61, 63 (2d Cir. 2021)). Here, the Court takes judicial notice of the video, which is referenced in and relied on by the Complaint. *See* Compl. Plaintiffs do not dispute that the submission by Defendants is a true and correct copy of the video.

## III. DISCUSSION

The Complaint alleges six claims[2] against Defendants: (1) Cooperstown Properties alleges federal trademark infringement of a registered trademark, in violation of the Lanham Act, 15 U.S.C. § 1114(1) (first claim), (2) both Plaintiffs allege federal unfair competition, in violation of the Lanham Act, 15 U.S.C. § 1125(a) (second claim), (3) Cooperstown Properties alleges infringement of registered copyrights, in violation of 17 U.S.C. §§ 501-503 (third claim), and (4) both Plaintiffs allege New York common law trademark infringement (fifth claim) and unfair

[2] The complaint does not identify a fourth claim. The Court refers to the counts as they are numbered in the complaint.

competition (sixth claim), as well as trademark dilution, in violation of New York General Business Law § 360-1 (seventh claim).

**A. Copyright Infringement**

Plaintiffs allege a copyright infringement claim for the video's use of the logo, the MLB photos, and the video excerpts (the registered works). Compl. ¶¶ 21, 61–70. Defendants argue that dismissal of the copyright infringement claim is warranted based on the fair use doctrine. Dkt. No. 15-1 at 8. Specifically, Defendants argue that the video "is undeniably transformative, and each fair use factor either favors Defendants or is neutral to the analysis." *Id.* at 13. Plaintiffs respond that all of the factors weigh in their favor and that Defendants have not met their burden to establish that the complaint should be dismissed at this early stage of the litigation. Dkt. No. 20 at 11-22.

"In a copyright action, the affirmative defense of fair use 'excuses what might otherwise be considered infringing behavior, allowing courts to avoid rigid application of the Copyright Act when it would stifle the very creativity the Act is meant to promote.'" *Santos v. Kimmel*, 154 F.4th 30, 33–34 (2d Cir. 2025) (quoting *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 179 (2d Cir. 2024) (quotation marks omitted)). The fair use doctrine "provides that 'the fair use of a copyrighted work, . . . for purposes such as criticism, comment, [or] news reporting [ ] . . . is not an infringement of copyright.'" *Graham v. Prince*, 265 F. Supp. 3d 366, 376 (S.D.N.Y. 2017) (quoting 17 U.S.C. § 107).

"Under the Copyright Act, [courts] consider the following non-exclusive factors in determining whether fair use has been established: (1) the purpose and character of the use . . . ; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used . . . ; and (4) the effect of the use upon the potential market for or value of the copyrighted work." *Santos*, 154 F.4th at 34 (quoting 17 U.S.C. § 107). "All four factors listed in § 107 'are to be

explored, and the results weighed together, in light of the purposes of the copyright.'" *Santos v. Kimmel*, 745 F. Supp. 3d 153, 163 (S.D.N.Y. 2024) (quoting *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 37 (2d Cir. 2021), *aff'd sub nom. Warhol*, 598 U.S. 508 (2023)). In addition, "[t]he list of factors is not exhaustive." *Id.* (quoting *Google LLC v. Oracle America, Inc.*, 593 U.S. 1, 18 (2021)).

"[T]he party asserting fair use bears the burden of proof." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 213 (2d Cir. 2015) (internal citation omitted). As an affirmative defense, fair use is "most frequently resolved at summary judgment," but "[a]n affirmative defense may be raised by a pre-answer motion to dismiss . . . 'if the defense appears on the face of the complaint.'" *Kimmel*, 745 F. Supp. 3d at 162 (quoting *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 319 (2d Cir. 2021) (citation omitted)); *see also Whiddon v. Buzzfeed, Inc.*, 638 F. Supp. 3d 342, 350 (S.D.N.Y. 2022) ("Courts may adjudicate an affirmative defense on a motion to dismiss 'where the facts necessary to establish the defense are evident on the face of the complaint.'") (quoting *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013)). "Accordingly, when 'the only two pieces of evidence needed to decide the question of fair use' are 'the original version' and the allegedly infringing version, it is proper to decide the issue on a motion to dismiss." *Whiddon*, 638 F. Supp. 3d at 350 (quoting *Yang v. Mic Network, Inc.*, 405 F. Supp. 3d 537, 542 (S.D.N.Y. 2019)).

**1. Purpose and Character of the Use**

Although this factor includes consideration of "whether such use is of a commercial nature," 17 U.S.C. § 107, the Second Circuit "'focuses chiefly on the degree to which the use is transformative, *i.e.*, whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character.'" *Santos*, 154 F.4th at 34 (quoting *Warhol*, 11 F.4th at 37) (quotation marks omitted)). "[T]he more transformative

the [ ] work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994).

"Where a copied work is being used for one of the purposes identified in the preamble of § 107, there is a 'strong presumption' in favor of fair use." *Kimmel*, 745 F. Supp. 3d at 164 (quoting *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477 (2d Cir. 2004) (citation omitted)). "Among the best recognized justifications for copying from another's work is to provide comment on it or criticism of it." *Authors Guild*, 804 F.3d at 215. "This is because '[c]riticism of a work . . . ordinarily does not supersede the objects of, or supplant, the work. Rather, it uses the work to serve a distinct end.'" *Kimmel*, 745 F. Supp. 3d at 153 (quoting *Warhol*, 598 U.S. at 528).

"The Supreme Court has recognized that 'parody has an obvious claim to transformative value' because, '[l]ike less ostensibly humorous forms of criticism, it can provide social benefit, by shedding light on an earlier work, and, in the process, creating a new one.'" *Sketchworks Indus. Strength Comedy, Inc. v. Jacobs*, No. 19-cv-7470, 2022 WL 1501024, at *3 (S.D.N.Y. May 12, 2022) (quoting *Campbell*, 510 U.S. at 579); *see also Warhol*, 11 F.4th at 37 ("[P]arody, which needs to mimic an original to make its point, is routinely held transformative." (internal quotation and citation omitted)). Nevertheless, "parody, like any other use, has to work its way through the relevant factors, and be judged case by case, in light of the ends of the copyright law." *Campbell*, 510 U.S. at 581. On the other hand, "once a work is determined to be a parody, the second, third, and fourth factors are unlikely to militate against a finding of fair use." *Abilene Music, Inc. v. Sony Music Ent., Inc.*, 320 F. Supp. 2d 84, 89 (S.D.N.Y. 2003).

Here, Defendants argue that the video is "highly transformative and critical of the tournament as it is depicted by Plaintiffs in the Registered Works, by employing 'unhinged' but good-natured parody which targets Plaintiffs' tournament and the Registered Works with humor

and ridicule." Dkt. No. 15-1 at 13. Defendants maintain that the video does not share a similar purpose as the registered works, and that any commercial element to posting the video on social media does not outweigh the video's transformative purpose. *Id.* at 13, 18. Plaintiffs contend that the purposes are "the same," focusing on the fact that the actual content of the videos, photographs, and logo as they appear in the video have not been physically altered in any meaningful way. Dkt. No. 20 at 15. Plaintiffs also argue similarity because "Defendants used Plaintiffs' copyrighted works in the [video] to create content that would grow their business, just as Plaintiffs use these works to grow their business." *Id.*

Here, based on an analysis of the Complaint and a side-by-side comparison of the works at issue, the Court concludes that Defendants used the registered works for the transformative purposes of criticism and commentary. Plaintiffs allege that they use the registered works "solely for advertising and promotional purposes on social media and Plaintiffs' website." Compl. ¶ 20. But a reasonable observer of the video could only understand it as ridiculing and critically commenting on Dreams Park. To the extent Plaintiffs rely on Defendants' reproduction of the registered works without substantial alteration, "[t]he reproduction of a copyrighted image in a larger collage is transformative where the copyrighted work is used as 'raw material,' in furtherance of distinctive creative or communicative objectives." *MCM Grp. 22 LLC v. Perry*, 818 F. Supp. 3d 623, 630 (S.D.N.Y. 2026) (cleaned up). Here, Defendants depict the logo and works in substantially their original forms, but in conjunction with a sarcastic-laden narrative making fun of "successful" youth athletes who must come to terms with the limits of their potential upon experiencing national competition at Dreams Park – the video in its entirety simply cannot be confused with promoting and advertising for Dreams Park. "[I]t is well recognized that '[p]arody needs to mimic an original to make its point, and so has some claim to use the creation

of its victim's . . . imagination.'" *Adjmi v. DLT Ent. Ltd.*, 97 F. Supp. 3d 512, 530 (S.D.N.Y. 2015) (quoting *Campbell*, 510 U.S. at 581). "The 'purpose and character' analysis assumes that the alleged parody will take from the original; the pertinent inquiry is how the alleged parody uses that original material." *Id.* Here, while Plaintiffs may take umbrage with the criticism thrown at Dreams Park, they cannot reasonably dispute the transformative nature of the video.

Because the Court determines that the video is a criticism and parody, utilizing the registered works as raw material to further its purpose, it is thus transformative in nature. To this end, "it is of little significance that the use is also of a commercial nature." *Lombardo v. Dr. Seuss Enters., L.P.*, 279 F. Supp. 3d 497, 510 (S.D.N.Y. 2017), *aff'd*, 729 F. App'x 131 (2d Cir. 2018); *see also Google*, 593 U.S. at 1204 ("[E]ven though Google's use was a commercial endeavor . . . that is not dispositive of the first factor, particularly in light of the inherently transformative role that the reimplementation played in the new [work]."). Accordingly, the first factor weighs in favor of finding that Defendants make fair use of Plaintiffs' registered works.

### 2. The Nature of the Copyrighted Work

For the second factor, courts consider: "(1) whether it is "expressive or creative . . . or more factual, with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope of fair use involving unpublished works being considerably narrower." *Warhol*, 11 F.4th at 45 (quoting *Blanch v. Koons*, 467 F.3d 244, 256 (2d Cir. 2006)). "This factor generally favors the fair use defense when a copyrighted work is more 'informational or functional' than 'creative.'" *Kimmel*, 745 F. Supp. 3d at 166 (quoting 4 Nimmer on Copyright § 13F.06 [A] (2024)). "The second factor has 'rarely,' however, played a significant role in the determination of a fair use dispute since even factual works are entitled to copyright protection." *Id.* (quoting *Authors Guild*, 804 F.3d at 220).

Defendants acknowledge that the copywritten material "could be construed as employing creative expression, [as] opposed to being factual in nature," but argue that this factor is nevertheless neutral because "courts routinely decline to afford this factor any weight beyond neutral when the allegedly infringing work, like the [video], involves parody, as borrowing from the original work is necessary." Dkt. No. 15-1 at 20 (citations omitted). Plaintiffs respond that this factor "favors Plaintiffs or is neutral," because Defendants concede that the copywritten materials "could be construed as employing creative expression," and that "is enough for" this factor "to tip in Plaintiffs' favor for purposes of this [motion]." Dkt. No. 20 at 18 (quoting Dkt. No. 15-1 at 14-15 and citing *Nat'l Acad. of Television Arts and Scis., Inc. v. Multimedia Sys. Design, Inc.*, 551 F. Supp. 3d 408, 424 (S.D.N.Y. 2021)). Plaintiffs also argue that the cases cited by Defendants are distinguishable because the video is not a parody. *Id.*

Here, given Defendants' concession that the copywritten material could be construed as creative, at this stage of the litigation the Court finds that this factor weighs against fair use. *See Nat'l Acad. of Television Arts and Scis., Inc.*, 551 F. Supp. 3d at 424 ("Because Defendant concedes that the [copywritten material] is 'arguably creative,' this factor weighs against a finding of fair use.") (record citation omitted). However, the Court declines to afford much weight to this factor. As previously explained, the Court has determined that the video is a criticism and parody of Dreams Park. Because "parodies almost invariably copy publicly known, expressive works," this factor is "not much help" in determining whether the new work constitutes fair use. *Campbell*, 510 U.S. at 586; *see also Lombardo*, 279 F. Supp. 3d at 511 ("[A]lthough this factor favors defendant because Grinch is a creative work, I decline to give much weight to this factor in light of the Play's parodic nature.").

### 3. Amount and Substantiality of the Portion Used

The "ultimate question" for the third factor—"the amount and substantiality of the portion used in relation to the copyrighted work as a whole"—"is whether the quantity and value of the materials used are reasonable in relation to the purpose of the copying." *Kimmel*, 745 F. Supp. 3d at 166 (quoting 17 U.S.C. § 107(3); *Warhol*, 11 F.4th at 46). "Even a small amount of copying may fall outside the scope of the fair use doctrine where the excerpt copied consists of the heart of the original work." *Id.* (cleaned up). "On the other hand, a court may consider whether the substantiality of the challenged use 'was tethered to a valid, and transformative, purpose.'" *Id.* (quoting *Google*, 593 U.S. at 34). "In general, 'the more of a copyrighted work that is taken, the less likely the use is to be fair.'" *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 89 (2d Cir. 2014) (quoting *Infinity Broad. Corp. v. Kirkwood,* 150 F.3d 104, 109 (2d Cir. 1998)). Nevertheless, "[c]opying 'the entirety of a work is sometimes necessary to make a fair use.'" *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006) (collecting cases).

Defendants argue that "only a reasonable amount of the content was taken from each work for the purpose of parody, criticism and comment." Dkt. No. 15-1 at 22. In addition, Defendants assert that the video "does not serve as a market substitute for any of Plaintiffs' works, as these works are solely used by Plaintiffs for advertising—and the [video] is the antithesis of advertising for Plaintiffs." *Id.* (citations omitted). Defendants argue that this factor therefore "strongly favors Defendants for all works," and that even for the logo and the MLB pictures, "the most generous finding for Plaintiffs would be a finding of neutrality." *Id.* Plaintiffs respond that the fact that the copywritten material was "used for short periods of time within the longer" video, is not persuasive; the alterations to the MLB photos are "much less significant than those in *Warhol*;" the excerpts from the orientation videos should not be treated as one combined video; the two-second excerpt from the championship video was "not so trivial as to warrant dismissal," and the

parody arguments do not apply here particularly given that Defendants have not explained "why their purported commentary could not be conveyed without shamelessly misappropriating Plaintiffs' works." Dkt. No. 20 at 20-21.

Here, Plaintiffs have established that the entirety of the logo in unedited form, along with the MLB photographs, are reproduced in the video in their entirety or with minimal cropping. However, at least one video, the championship video, is reproduced at a substantially smaller scale - two seconds of the 35 second clip. With respect to the final video (or videos) at issue, the parties dispute whether the Orientation 1 excerpt and Orientation 2 excerpt should be treated as taken from one longer, combined video initially registered by Plaintiffs, or "copying five seconds of combined nine second video clips" that were subsequently registered. *Id.* at 19-20. For purposes of this motion, the Court adopts Plaintiffs' position that the Orientation 1 excerpt and Orientation 2 excerpt should be treated as reproducing substantially all of the limited, subsequently registered clips.

Undisputedly, the video incorporates some of the registered works in full, and some to a lesser extent. Nevertheless, "the third factor is not analyzed in a vacuum." *Adjmi.*, 97 F. Supp. 3d at 534. "In articulating a standard for determining the amount a parody may copy from the original, the Supreme Court set a floor, not a ceiling: 'When a parody takes aim at a particular original work, the parody must be able to "conjure up" at least enough of the original to make the object of its critical wit recognizable.'" *Id.* (quoting *Campbell*, 510 U.S. at 588). "And that floor is considered in light of the first and fourth factors." *Id.* "Because '[p]arody's humor, or in any event its comment, necessarily springs from recognizable allusion to its object through distorted imitation[,]' 'quotation of the original's most distinctive or memorable features, which the parodist can be sure the audience will know,' cannot be avoided." *Sketchworks*, 2022 WL 1501024, at *6

(quoting *Campbell*, 510 U.S. at 588). "The inquiry 'seeks to draw a line between taking enough to evoke the original and excessive appropriation.'" *Id.* (quoting *Adjmi*, 97 F. Supp. 3d at 533). On these grounds, the Court concludes that while the video takes substantial portions of Plaintiffs' works at issue, any weight afforded to Plaintiffs on this issue is tempered by the video's purpose as a transformative parody and, as expressed below, the minimal effect of the video on the market for Plaintiffs' works. Accordingly, this factor weighs neutral in the analysis.

**4. Effect of Use on the Market**

"The fourth factor under § 107 considers 'whether, if the challenged use becomes widespread, it will adversely affect the potential market for the copyrighted work' and for the market for any derivative work." *Kimmel*, 745 F. Supp. 3d at 167 (quoting *Warhol*, 11 F.4th at 48) (citation omitted)). "The question is whether the copying '*usurps* the market for the first by offering a competing substitute.'" *Id.* (quoting *Warhol,* 11 F.4th at 48). "In weighing this factor, a court may consider where appropriate any public benefits or harms from the copying and their extent." *Id.* (citing *Google*, 593 U.S. at 35-36). "There is, however, 'no protectible derivative market for criticism,' because '[t]he market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop,' and 'the unlikelihood that creators of imaginative works will license critical reviews or lampoons of their own productions removes such uses from the very notion of a potential licensing market.'" *Id.* (quoting *Campbell*, 510 U.S. at 592); *see also Santos*, 154 F.4th at 35 ("[w]e ask not whether the second work would damage the market for the first (by, for example, devaluing it through parody or criticism), but whether it usurps the market for the first by offering a competing substitute.")

Here, Defendants argue that given the nature of the video, there is no opportunity for usurpation and that this factor weighs heavily in their favor. Dkt. No. 15-1 at 23. Plaintiffs argue that Defendants claim that the video is not a competing substitute for Plaintiffs works is not enough

to tilt the factor in Defendants favor, because the Court must look at "both the primary market for the work and any derivative markets that exist or that its author might reasonably license others to develop, regardless of whether the particular author claiming infringement has elected to develop such markets." Dkt. No. 20 at 21 (quoting *Warhol*, 11 F.4th at 48). Plaintiffs claim that because Defendants have used their copyrighted works on their social medial channels, where Plaintiffs also post the same works for their own purposes, the "widespread and unrestrained use of Plaintiffs' copyrighted works in videos across social media would harm or eliminate Plaintiffs' potential market to license their works for other uses." *Id.* at 22. Last, Plaintiffs allege that the reputational harm they have suffered from Defendants' use of their copywritten works tips the factor in their favor. *Id.*

Plaintiffs do not plausibly allege that the video offers a competing substitute to Dreams Park, and their allegation that Defendants are "tarnish[ing] the reputation of Plaintiffs and attendees at their Dream Park facility" is not a basis to establish this factor of the analysis. Nor do Plaintiffs plausibly allege that they have any future potential market prospects in creating social media content criticizing Dreams Park, in fact, the allegations suggest the contrary. *See* Compl. ¶ 13 (alleging that "baseball enthusiasts have enjoyed the sport of baseball and Plaintiffs' camp in the world-class Cooperstown Dreams Park youth baseball facility located in Cooperstown, New York."). Accordingly, the Court finds that these works occupy distinct and separate markets, with little risk that Defendants' video poses a threat to Plaintiffs' potential market. *See Lombardo*, 279 F. Supp. 3d at 512-13 ("[T]o the extent the Play causes fans of Dr. Seuss to abandon the original work altogether, such a concern is irrelevant, for the court's "concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps the market of the original work.'") (quoting *NXIVM Corp.*, 364

F.3d at 482); *see also id.* at 513 (weighing this factor in favor of alleged copyright infringer of the *Grinch* where "defendant makes no allegations that it intends to authorize a parody containing references to bestiality, drug use, and other distinctly 'un-Seussian' topics."). Accordingly, this factor weighs strongly in favor of Defendants and a finding of fair use.

#### 5. Balance of the Factors

For the foregoing reasons, the balance of the fair use factors weighs in favor of a fair-use finding even at this early stage of the litigation. Defendants' motion to dismiss Plaintiffs' copyright infringement claim is therefore granted because Defendants' use was, as a matter of law, fair use.

### B. Trademark Infringement and Unfair Competition

"To prevail on a trademark infringement [or unfair competition][3] claim under the Lanham Act, the plaintiff must show that: (1) plaintiff owns a valid protectable mark; and (2) defendant's use of a similar mark is likely to cause consumer confusion as to the origin or association of the goods or services." *Vans, Inc. v. MSCHF Prod. Studio, Inc.*, 88 F.4th 125, 135–36 (2d Cir. 2023). "[I]n either a claim of trademark infringement under § 32 or a claim of unfair competition under § 43, a prima facie case is made out by showing the use of one's trademark by another in a way that is likely to confuse consumers as to the source of the product." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986); *see Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 129 (2d Cir. 2004).

---

[3] Because the analysis under both provisions is the same, the Court addresses the two sets of claims together. *See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 114 (2d Cir. 2009) (analyzing merits of trademark infringement and unfair competition claims in tandem); *A&E Television Networks, LLC v. Big Fish Ent., LLC*, No. 22 Civ. 7411, 2023 WL 4053871, at *14 (S.D.N.Y. June 16, 2023) (same).

The Second Circuit "applies the eight-factor test identified in *Polaroid* to assess the likelihood that an allegedly infringing product will create consumer confusion." *Vans*, 88 F.4th at 136.

> The eight factors are: (1) strength of the trademark; (2) similarity between the two marks; (3) proximity of the products and their competitiveness with one another; (4) likelihood the prior owner may 'bridge the gap' in the markets for their products; (5) evidence of actual consumer confusion; (6) the defendant's good faith in adopting its imitative mark; (7) quality of the defendant's product compared with the plaintiff's product; and (8) sophistication of the buyers.

*Id.* (citing *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961)).

"The traditional infringement inquiry may be applied more narrowly if the allegedly infringing good or service is a work of 'artistic expression.'" *Vans*, 88 F.4th at 136 (citation omitted). In *Rogers v. Grimaldi,* 875 F.2d 994, 999 (2d Cir. 1989), the Second Circuit "held that the Lanham Act should not apply to 'artistic works' as long as the defendant's use of the mark is (1) artistically relevant to the work, and (2) not 'explicitly misleading' as to the source or content of the work." *Id.* (quoting *Rogers*, 875 F.2d at 999); *see also Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd*, 996 F.2d 1366, 1379 (2d Cir. 1993) (requiring the likelihood of confusion to be "particularly compelling" to outweigh the First Amendment concerns). "This approach takes into account the ultimate test in trademark law, namely, the likelihood of confusion as to the source of the goods in question." *Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp., Inc.*, 886 F.2d 490, 495 (2d Cir. 1989) (cleaned up). "At the same time, a balancing approach allows greater latitude for works such as parodies, in which expression, and not commercial exploitation of another's trademark, is the primary intent, and in which there is a need to evoke the original work being parodied." *Id*. "Thus, where the unauthorized use of a trademark is for expressive purposes of comedy, parody, allusion, criticism, news reporting, and commentary, the law requires a balancing of the rights of the trademark owner against the interests of free speech." *Lombardo*, 279 F. Supp.

3d at 514 (quoting *Yankee Pub. Inc. v. News Am. Pub. Inc.*, 809 F. Supp. 267, 276 (S.D.N.Y. 1992)).

The Supreme Court has recently reiterated its view on trademark infringement, clarifying that the *Rogers* test and its heightened First Amendment protections do not apply when the allegedly infringing mark is used as a source identifier, i.e. "as a designation of source for the [alleged infringer's] own goods." *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 153 (2023); *see id.* at 157 ("Consumer confusion about source—trademark law's cardinal sin—is most likely to arise when someone uses another's trademark as a trademark. In such cases, *Rogers* has no proper application."). The Supreme Court declined to adopt the Ninth Circuit's holding that *Rogers* applied to all "expressive works[s]," explaining that it does not provide a "shortcut to dismissal" merely because "the use of a mark has other expressive content – *i.e.*, because it conveys some message on top of source." *Id.* at 153, 157; *see id.* at 157-58 (rejecting Ninth Circuit's conclusion that "because Bad Spaniels 'communicated a humorous message,' it is automatically entitled to *Rogers*' protection."). Accordingly, it is clear that use of another's registered marks for purposes of parody does automatically invoke the *Rogers* test if, in conjunction with their parodic purpose, they are used as a designation of source for the infringer's own goods.

Here, Defendants maintain that Plaintiff's Lanham Act claims should be dismissed pursuant to *Rogers*. Specifically, Defendants contend that the video is unquestionably an expressive work, the use of the Plaintiffs' marks has artistic relevance, and the video is not explicitly misleading. Dkt. No. 15-1 at 26-27. In response, Plaintiffs cite to the *Jack Daniel's* holding concerning the limited application of *Rogers*. Plaintiffs contend that *Rogers* does not apply to Defendants' use of their marks because "they were used to denote the source of Defendants' services and the [] video. Dkt. No. 20 at 24-25. Plaintiffs alternatively argue that

even if *Rogers* applies, Defendants' use of the marks was commercial, not artistic, and that the Defendants have failed to address the *Polaroid* factors, let alone show they favor Defendants. *Id.*

The threshold inquiry here is whether Defendants were "mak[ing] trademark use of [Plaintiffs'] marks." *Jack Daniels,* 599 U.S. at 156. Of course, this inquiry leads to the real issue at dispute between the parties –what does it mean to "use a mark as a mark," to use a mark for "source identification," or to "trade[] on the good will of the trademark owner to market [one's] own goods?" *See id.* at 148, 156. In one pre-*Jack Daniel's* opinion, the Second Circuit considered the following in deciding whether the Defendants' alleged use of the Plaintiff's trademark was as a designation of source:

> A defendant uses a term "as a mark" when it employs it "as a symbol to attract public attention," *Kelly-Brown*, 717 F.3d at 306 (internal quotation marks omitted), or "to identify and distinguish . . . goods [or services] . . . and to indicate [their] source." 15 U.S.C. § 1127. Whether a defendant has done so may entail an investigation into, *inter alia*, whether the challenged material appeared on the product "itself, on its packaging, or in any other advertising or promotional materials related to [the] product," and the degree to which "defendants were trying to create, through repetition . . . a[n] association between [themselves] and the [mark]." *Kelly-Brown*, 717 F.3d at 310-11 (internal quotation marks omitted).

*Tiffany & Co. v. Costco Wholesale Corp.,* 971 F.3d 74, 92 (2d Cir. 2020).

In *Vans*, decided after *Jack Daniel's,* the Second Circuit expressed the following in concluding that the district court correctly declined to apply the *Rogers* test to the matter at hand:

> A trademark is used as a "source identifier" when it is used "to identify or brand a defendant's goods or services" or to indicate the " 'source or origin' of a product." *Id*. at 156, 143 S.Ct. 1578 (alterations adopted). MSCHF used Vans' trademarks—particularly its red and white logo—to brand its own products, which constitutes "quintessential 'trademark use'" subject to the Lanham Act. *Id*. at 155, 143 S.Ct. 1578 (citation omitted); *see also Harley Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 812–13 (mechanic's use of Harley-Davidson's bar and shield motif in his logo, despite the "humorous[ ]" message, was traditional trademark use subject to the likelihood of confusion analysis).
>
> Moreover, although MSCHF did not purport to sell the Wavy Baby under the Vans brand, it admitted to "start[ing]" with Vans' marks because "[n]o other shoe

> embodies the dichotomies—niche and mass taste, functional and trendy, utilitarian and frivolous—as perfectly as the Old Skool." Jt. App'x at 353. In other words, MSCHF sought to benefit from the "good will" that Vans—as the source of the Old Skool and its distinctive marks—had generated over a decades-long period. *See Jack Daniel's*, 599 U.S. at 156, 143 S.Ct. 1578. Notwithstanding the Wavy Baby's expressive content, MSCHF used Vans' trademarks in a source-identifying manner.

88 F. 4th at 138-39. Indeed, in *Jack Daniel's* the Supreme Court cited to the marks at issue in *Louis Vuitton Malletier S. A. v. Warner Bros. Entertainment Inc.*, 868 F. Supp. 2d 172 (S.D.N.Y. 2012), to help courts distinguish between the use of a trademark as a source identifier versus for some other expressive function:

> Suppose a filmmaker uses a Louis Vuitton suitcase to convey something about a character (he is the kind of person who wants to be seen with the product but doesn't know how to pronounce its name). *See supra*, at 1588. Now think about a different scenario: A luggage manufacturer uses an ever-so-slightly modified LV logo to make inroads in the suitcase market. The greater likelihood of confusion inheres in the latter use, because it is the one conveying information (or misinformation) about who is responsible for a product. That kind of use "implicate[s] the core concerns of trademark law" and creates "the paradigmatic infringement case."

599 U.S. at 157; *see also Louis Vuitton*, 868 F. Supp. 2d at 180 (identifying "those situations that present the greatest risk of consumer confusion: namely, when trademarks are used to "dupe[ ] consumers into buying a product they mistakenly believe is sponsored by the trademark owner.").

In this instance, the Court concludes that the Defendants' use of Plaintiffs' marks does not purport to designate the source of the video – i.e., that it came from and is promoted by Plaintiffs and their affiliated enterprises. Nor can the video be interpreted to represent an association between the two. Instead, the marks appear within an over-the-top, parodic narrative blatantly criticizing Dreams Park. It is hard to imagine how Defendants' treatment of Dreams Park, as depicted in the video and by use of the marks, can be viewed as seeking to "trad[e] on the good will of the trademark owner to market its own goods."

Plaintiffs have not cited to any post *Jack-Daniel's* or *Vans* authority suggesting that the Defendants' use of their marks – in conjunction with, and to identify the subject of, their critical narrative posted on social media – constitutes use as a source identifier, and otherwise "[m]ere unauthorized use does not by itself make out a cause of action[.]" *Yankee Pub. Inc. v. News Am. Pub. Inc.*, 809 F. Supp. 267, 273 (S.D.N.Y. 1992). On the contrary, this Court's conclusion is consistent with post-*Jack Daniel's* lower-court opinions that have since addressed the issue. *See Down to Earth Organics*, *LLC v. Efron*, No. 22-cv-06218, 2024 WL 1376532, at *4 (S.D.N.Y. Mar. 31, 2024) (declining to find Defendants' use of a trademark as a source identifier where they used the mark "simply to identify the subject matter and tone of the" Defendants' work); *JTH Tax LLC v. AMC Networks Inc.*, 694 F. Supp. 3d 315, 332-33 (S.D.N.Y. 2023) (finding to the extent that defendants used plaintiff's "Liberty Tax" trademark in its television show Better Call Saul, it was only in the furtherance of the show's plot and not to identify the source of the show). Accordingly, application of the *Rogers* test is appropriate in this instance, and does not contravene the holdings in either *Jack Daniel's* or *Vans*. *See Down to Earth Organics,* 2024 WL 1376532, at *5; *JTH Tax*, 694 F. Supp. 3d at 333.

The Court addresses each prong of *Rogers* in turn. As to the first prong, the video's use of Plaintiffs' marks is artistically relevant and central to the underlying work. The marks identify the object of Defendants' criticism, without which "the commentary would lose its comedic and critical impact." Dkt. No. 15-1 at 26. Indeed, the marks were "not arbitrarily chosen just to exploit the publicity value of" Dreams Park, but "instead ha[s] genuine relevance to the" video's purpose. *Rogers*, 875 F.2d at 1001; *see also Sketchworks,* 2022 WL 1501024 at *8 (use of marks in opening credits and advertising material communicated the object of the parody); *Lombardo*, 279 F. Supp. 3d at 514 (trademarked elements in promotional materials served "plaintiffs' parodic purpose" as

a "parodic work must necessarily evoke elements of the original work, including trademarked elements").

Because the marks have some artistic relevance to the video, Defendants' use of it "is unprotected only if it 'explicitly misleads as to the source or the content of the work.'" *Louis Vuitton*, 868 F. Supp. 2d at 179 (quoting *Rogers,* 875 F.2d at 999). "[T]he relevant question is whether the defendant's use of the mark 'is misleading in the sense that it induces members of the public to believe [the work] was prepared or otherwise authorized' by the plaintiff." *Id.* (quoting *Twin Peaks*, 996 F.2d at 1379). "The explicitly misleading determination 'must be made, in the first instance, by application of the venerable Polaroid [likelihood of confusion] factors.'" *Id.* (quoting *Twin Peaks*, 996 F.2d at 1379). Nevertheless, "[t]he evaluation of the *Polaroid* factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000) (citation omitted)). "Only a 'particularly compelling' finding of likelihood of confusion can overcome the First Amendment interests." *Id.* (quoting *Twin Peaks*, 996 F.2d at 1379).

To this end, with the *Polaroid* factors as context, the Court finds little risk that consumers of Plaintiffs' goods are likely to be misled as to the source of Defendants' work. To be sure, Plaintiffs' mark is distinct and replicated in Defendants' video. However, where marks are being used as part of a "jest or commentary," this is not a strong indicator of confusion. *Yankee Pub. Inc.*, 809 F.Supp. at 273; *see also Sketchworks*, 2022 WL 1501024, at *8 (parody of Grease "plainly served a critical purpose" and "could not reasonably be viewed as an authorized derivative work"). In addition, Plaintiffs' youth baseball program, and Defendants' criticism thereof, are far from proximate, and by no means serve the same purpose. Nor is there a likelihood that Plaintiffs

would enter Defendants' market in the future, or that consumers will perceive Plaintiffs as likely to do so. Plaintiffs allege that Defendants' actions have caused confusion as to "the true source of Defendants' services, and as to the sponsorship or approval of Defendants or their services by" Plaintiffs. Compl. ¶ 56. However, Plaintiffs do not support these rather conclusory allegations with any factual detail, and the viewer comments associated with the video suggest that little confusion has been made as to the critical nature of Defendants' video.

"The *Rogers* test and *Polaroid* factors may appropriately be applied on a motion to dismiss, particularly 'where the court is satisfied that the products or marks are so dissimilar that no question of fact is presented.'" *Down to Earth Organics*, 2024 WL 1376532, at *9 (quoting *Medina v. Dash Films, Inc.*, No. 15-cv-2551, 2016 WL 3906714, at *5 (S.D.N.Y. July 14, 2016) (in turn quoting *Louis Vuitton*, 868 F. Supp. 2d at 183)). Although allegations are deemed true on a motion to dismiss, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citation omitted). Here, the Court concludes that Plaintiffs' allegations of confusion "are not plausible, let alone particularly compelling as is required to sustain a Lanham Act claim when First Amendment values are involved." *JTH Tax LLC*, 694 F. Supp. 3d at 340 (cleaned up). Accordingly, Defendants' motion to dismiss Plaintiffs' Lanham Act claims is granted.

**C. State Law Claims**

Plaintiffs assert three claims for relief under New York state law: New York common law trademark infringement, New York common law unfair competition, and trademark dilution under New York General Business Law. *See* Compl. ¶¶ 71–84. Having determined, for the reasons set forth above, that Plaintiffs have not asserted a viable federal claim, the Court must determine whether Plaintiffs have established diversity jurisdiction over their state-law claims, or, in the absence of diversity jurisdiction, whether the Court should exercise supplemental jurisdiction. In

the Complaint, Plaintiffs assert that this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a), *see* Compl. ¶ 4.

District courts have "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States." 28 U.S.C. § 1332(a). Section 1332 "requires 'complete diversity,' *i.e.* all plaintiffs must be citizens of states diverse from those of all defendants." *Penn. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 117–18 (2d Cir. 2014). For the purposes of establishing diversity jurisdiction, a limited liability company is a citizen of each state in which its individual members are citizens. *See, e.g.*, *Barnes v. Fort Hamilton Fam. Homes*, 524 F. Supp. 3d 40, 42 (E.D.N.Y. 2021) ("For diversity purposes, LLCs have the imputed citizenship of each of their members."); *Castillo Grand, LLC v. Sheraton Operating Corp.*, 719 F.3d 120, 122 (2d Cir. 2013). "In pleading an LLC's citizenship, the identity and citizenship of each member has to be specifically alleged." *United States Liab. Ins. Co. v. M. Remodeling Corp.*, 444 F. Supp. 3d 408, 410 (E.D.N.Y. 2020) (citing *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 60 (2d Cir. 2016) (holding allegation that an LLC "is a citizen of a different state" is deficient "because it contains no allegation as to the identity or citizenship" of the members); *In re Bank of Am. Corp. Secs., Derivative, & ERISA Litig.*, 757 F. Supp. 2d 260, 334 n.17 (S.D.N.Y. 2010) ("Because the Derivative Plaintiffs have not alleged the citizenship of each of the Financial Advisors' members . . . they have not alleged facts sufficient to invoke this Court's subject matter jurisdiction by reason of diversity of citizenship.")). "When challenged by the court or another litigant, 'the party asserting subject matter jurisdiction . . . has the burden of proving that it exists by a preponderance of the evidence.'" *Id.* (quoting *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 443 (2d Cir. 2019)).

Here, Plaintiff Cooperstown Properties, LLC is a North Carolina limited liability company licensed and registered to do business in New York, and Plaintiff Cooperstown Dreams Park, Inc. is a North Carolina corporation licensed and registered to do business in New York. *See* Compl. ¶¶ 7, 8. Plaintiffs plead that Defendant Baseball Doesn't Exist LLC is a Virginia limited liability company with a principal place of business in Richmond, Virginia, and Defendant Joey Duffield, a member of Defendant Baseball Doesn't Exist LLC, is an individual residing in Falls Church, Virginia. *See id.* ¶¶ 9, 10. The Complaint does not identify each and every member of Defendant Baseball Doesn't Exist LLC, nor does it properly plead each member's citizenship. It only states that Defendant Baseball Doesn't Exist LLC is a Virginia limited liability company, and that Defendant Joey Duffield is "a" member of Defendant Baseball Doesn't Exist LLC who resides in Virginia. Compl. ¶ 10. The same is true for Plaintiff Cooperstown Properties, LLC, which is said to be a North Carolina limited liability company without identifying each and every member and their citizenship. *Id.* at ¶ 7. As a result, the Court cannot determine at this time whether diversity jurisdiction exists on the face of the Complaint.

In the absence of diversity jurisdiction, the Court would need to assess whether to invoke supplemental jurisdiction. In light of these jurisdictional issues, Defendants' motion to dismiss Plaintiffs' state law claims is denied with leave to renew. Plaintiffs are directed to submit an affidavit to the Court within fifteen days of this Memorandum-Decision and Order asserting the complete membership of the party LLCs, including citizenship.

## IV. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion to dismiss under Rule 12(b)(6), Dkt. No. 15, is **GRANTED in part,** to the extent that Plaintiffs' federal trademark infringement claim (first claim

for relief), federal unfair competition claim (second claim for relief), and federal copyright infringement claim (third claim for relief) are **DISMISSED,** and it is further

**ORDERED** that Defendants' motion to dismiss under rule 12(b)(6), Dkt. No. 15, is **DENIED in part,** to the extent that the Court must resolve the outstanding jurisdictional issues prior to granting any relief on Plaintiffs' remaining state law claims. Plaintiffs are directed to submit an affidavit to the Court within fifteen days of this Memorandum-Decision and Order asserting the complete membership of the party LLCs, including citizenship.

**IT IS SO ORDERED.**

Dated: September 30, 2026

Elizabeth C. Coombe
U.S. District Judge